## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMUEL CARSON, | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No.** |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA; | : | |
| PHILADELPHIA POLICE | : | |
| DEPARTMENT; | : | |
| FORMER DISTRICT ATTORNEY | : | |
| LYNNE ABRAHAM, | : | |
| FORMER ASSISTANT DISTRICT | : | |
| ATTORNEY DAVID DESIDERIO, | : | |
| FORMER ASSISTANT DISTRICT | : | |
| ATTORNEY CHARLES J. GRANT, | : | |
| PHILADELPHIA POLICE HOMICIDE | : | |
| DETECTIVE MANGONI, BADGE | : | |
| NUMBER #642; | : | |
| PHILADELPHIA POLICE HOMICIDE | : | |
| DETECTIVE COLLINS, BADGE | : | |
| NUMBER #9030; | : | |
| PHILADELPHIA POLICE HOMICIDE | : | |
| DETECTIVE R. REINHOLD, BADGE | : | |
| NUMBER #692; | : | |
| PHILADELPHIA POLICE OFFICER | : | |
| GLENN KEENAN; | : | |
| JOHN DOE(S) OFFICERS | : | |
| and SUPERVISORS, 1-10; | : | |
| Individually and as employees for the | : | |
| City of Philadelphia, | : | |
| **Defendants.** | : | |

## COMPLAINT AND JURY DEMAND

Plaintiff Sam Carson, by and through his attorneys, Mincey Fitzpatrick Ross, LLC, allege:

## PRELIMINARY STATEMENT

1.     This matter involves an extreme miscarriage of justice.

2.      Sam Carson spent twenty-eight years in prison. Sixteen of those twenty-eight years Mr. Carson spent on Death Row at a Pennsylvania State Correctional Institution as he was wrongly convicted of Capital Murder and sentenced to death.

3.      As a death row inmate, Mr. Carson was subjected to mandatory solitary confinement and required to remain alone inside of his 8 by 12-foot cell for 22 hours per day on weekdays and not permitted out of the cell on weekends. It was mandated that each cell on death row had 24-hour illumination. And each time he was permitted to exit his cell Mr. Carson underwent a full body cavity search.

4.      Mr. Carson was denied any direct human contact with family members and denied direct access to lawyers during visitation. He was not eligible for employment or educational opportunities as a death row inmate. In addition, extreme limitations were placed on access to telephones, mail, outdoor exercise, daily showering, as well as religious services and materials. These conditions have been deemed cruel and unusual and in violation of the Eighth Amendment to the United States Constitution and they have been called "Draconian" The Honorable John E. Jones, III of the United States District Court for the Middle District of Pennsylvania.

5.      Mr. Carson must now attempt to make life for himself without the benefit of educational and/or vocational training that he was deprived because he was sentenced to death. Mr. Carson is also void of the socialization ability and characteristics that most adults are armed with, having spent 16 years in solitary confinement.

6.      Mr. Carson has sustained emotional and psychological injury that continue to date and will continue into the future. In addition, while in isolation for nearly two decades, Mr. Carson was deprived of many human experiences, from the simplistic to the most important. Mr.

Carson could not experience birthdays, share holidays, funerals or any of life's most basic events with loved ones.

7.      Because of the foregoing, Mr. Carson has suffered tremendously, including but not limited to physical harm, and mental suffering.

8.      Carson's wrongful Capital Murder conviction and continued wrongful incarceration on Death Row for sixteen years were directly caused by the misconduct of law enforcement officers from the City of Philadelphia Police Department and prosecutors from the Philadelphia District Attorney's Office (collectively "Defendants").

9.      As a result of Defendants' misconduct, including fabrication of inculpatory evidence, suppression of exculpatory evidence, and coercion of false testimony, Carson spent sixteen years on Death Row, sustaining compensable physical, psychological, and emotional injury, from which he may never recover.

10.     Petitioner was arrested, tried, convicted, and sentenced to death for the shooting death of William Lloyd, who was killed on the 2100 block of Clymer Street in the early morning hours of November 22, 1993.

11.     Carson's Capital Murder conviction occurred in the Philadelphia County Court of Common Pleas on July 14, 1995 (Ribner, J., presiding). David Desiderio was the trial prosecutor. On or about July 18, 1995, pursuant to the penalty phase proceedings, Mr. Carson was sentenced to death.

12.     On or about October 22, 2019, the Philadelphia District Attorney's Office made available the prosecution and investigatory files from his case in connection with his pending Petition for Writ of Habeas Corpus. It was then revealed that the Commonwealth possessed written and signed statements from witnesses Ronald Waters, Carlene Matthews, and

3

Gwendolyn Schilling, none of which they provided to Petitioner or his trial counsel. The Commonwealth was obliged to disclose these statements pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), but failed to comply with its constitutional obligation. Specifically, the Philadelphia Police and Assistant District Attorneys engaged in deliberate deception by concealing and/or suppressing material evidence. Due these constitutional violations, Plaintiff was sentenced to death on July 18, 1995. The Supreme Court of Pennsylvania affirmed Petitioner's convictions and death sentence in Commonwealth v. Carson, 741 A.2d 686 (Pa. 1999), cert. denied, 530 U.S. 1216 (2000) (Carson-1). Plaintiff was later resentenced to life imprisonment on April 4, 2011. [1]

13.     Twenty-seven years after the death penalty was imposed and upon consideration of a Post-Conviction Relief Action petitions filed on behalf of Mr. Carson, Plaintiff's convictions were finally vacated.

14.     Philadelphia Police and District Attorneys undermined the fairness of the Plaintiffs' trial and the validity of the jury's verdict. Plaintiff brings this action under 42 U.S.C. §1983 seeking redress for the extraordinary misconduct of Defendants who engaged in deliberate deception by concealing and/or suppressing material evidence, employed unlawful investigative techniques, presented false testimony, and, together with other Philadelphia police officers and Assistant District Attorneys, denied the Plaintiffs due process of law and a fair trial. The actions and conduct of the defendants were the results of policies, practices, customs, and deliberate

---

[1] Plaintiff filed a pro se petition for post-conviction relief in the Philadelphia Court of Common Pleas on June 16, 2000, which was later amended The Supreme Court of Pennsylvania affirmed the denial of those claims relating to the guilt-innocence phase of Petitioner's trial but remanded the matter for an evidentiary hearing on claims relating to ineffective assistance of counsel at Petitioner's penalty phase. *Commonwealth v. Carson*, 913 A.2d 220 (Pa. 2006), cert. denied, 552 U.S. 954 (2007) ("Carson-2"). Upon remand to the Court of Common Pleas, the Commonwealth agreed that Petitioner was entitled to penalty phase relief, which was granted on April 2, 2008. The Commonwealth abandoned its efforts to seek the death penalty and Petitioner was re-sentenced to life imprisonment on April 4, 2011

indifference on the part of Defendant City of Philadelphia, including the failure to properly train
and supervise officers and Assistant District Attorneys and Police officers, and the failure to take
disciplinary and remedial action against the defendants and others who commit serious
misconduct and abuses of authority.

II.     **JURISDICTION**

15.     This action is brought pursuant to 42 U.S.C. §1983. Jurisdiction is founded upon
28 U.S.C. §§1331 and 1343(1), (3), (4) and the aforementioned statutory provision. Plaintiff
further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367(a) to
adjudicate state law claims.

16.     Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all
parties reside in the Eastern District of Pennsylvania, and a substantial part of the events giving
rise to the claims asserted herein occurred within this district.

III.    **PARTIES**

17.     Plaintiff **Samuel Carson** is a resident of Commonwealth of Pennsylvania. He
currently resides within the City of Philadelphia. Carson was wrongfully convicted of Capital
Murder and sentenced to the Death Penalty by the Commonwealth of Pennsylvania and at all
times relevant to this action was in the Eastern District of Pennsylvania.

18.     Defendant **City of Philadelphia** is a municipality and political subdivision of the
Commonwealth of Pennsylvania and at all relevant times the employer of individual Defendants
PPD Officers and Supervisors, District Attorney Lynne Abraham, ADA David Desiderio and
ADA Charles Grant. The City of Philadelphia was at all times relevant to this complaint,
responsible for the policies, practice, and customs of the PPD and the DA's Office.

19.     Defendant **Former District Attorney Lynne Abraham** was at all times relevant to this complaint, duly elected and active supervising attorney of the Philadelphia District Attorney's Office who was acting within the scope of her employment and under color of law. Upon information and belief she is entitled to indemnification under statute and by contract. Defendant Abraham is sued in her individual capacity.

20.     Defendant **Former Assistant District Attorney David Desidero** was the trial prosecutor and at all times relevant to this action. Mr. Desidero was an active assistant district attorney and acting under color of state law. Upon information and belief, he is entitled to indemnification under statute and by contract. Defendant Desidero is sued in his individual capacity.

21.     Defendant **Former Assistant District Attorney Charles J. Grant** was the chief of the homicide division of the DA's Office at all times relevant to this action. Mr. Grant was an active assistant district attorney and acting under color of state law. Upon information and belief, he is entitled to indemnification under statute and by contract. Defendant Grant is sued in his individual capacity.

22.     Defendant **Philadelphia Homicide Detective Mangoni, Badge Number #642** was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of employment and under color of law. Upon information. And belief, he is entitled to indemnification under statute and contract. He is sued in his individual capacity.

23.     Defendant **Philadelphia Homicide Detective Collins, Badge Number #9030** was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting

within the scope of employment and under color of law. Upon information. And belief, he is entitled to indemnification under statute and contract. He is sued in his individual capacity.

24.     Defendant **Philadelphia Homicide Detective R. Reinhold, Badge Number #692** was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of employment and under color of law. Upon information. And belief, he is entitled to indemnification under statute and contract. He is sued in his individual capacity.

25.     Defendant **Philadelphia Police Officer Glenn Keenan** was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of employment and under color of law. Upon information. And belief, he is entitled to indemnification under statute and contract. He is sued in his individual capacity.

26.     Defendant **John Doe Officers 1-10** were, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of employment and under color of law. Upon information. And belief, he is entitled to indemnification under statute and contract. He is sued in his individual capacity.

27.     The designation "John Doe" is one of a fictious person or entity.

28.     At all relevant times, all defendants were acting in concert and conspiracy and their actions deprived the plaintiffs of their constitutional and statutory rights.

## IV.     FACTUAL ALLEGATIONS

29.     William Lloyd was found shot to death on the 2100 block Clymer Street, in Philadelphia on November 22, 1993.

30.     Defendants Mangoni, Collins, Reinhold, and Keenan (sometimes collectively referred to herein as "PPD Officers") directly participated in the investigation of the Lloyd murder by gathering evidence, obtaining witness statements, responding to and examining the crime scene, and creating and documenting investigative reports and activity sheets.

31.     Mr. Carson was arrested, charged, and subsequently tried for the Lloyd murder.

32.     The Commonwealth presented four main witnesses in its case in chief: Edgar Clark, Ramon Burton, Monique Wylie, and Ruth Beverly.

33.     On July 14, 1995, Mr. Carson was convicted of Capital Murder and the death penalty was imposed on July 18, 1995.

34.     On or about October 22, 2019, the Philadelphia District Attorney's Office made available the prosecution files and the homicide detective files pursuant to Plaintiff's Petition for Writ of Habeas Corpus.

35.     Located therein were memorialized witness statements of Ronald Waters, Carlene Matthews, and Gwendolyn Schilling, all of which were held in secret for over 25 years and only revealed in 2020.

36.     The statements of Ronald Waters and Carlene Matthews were completely exculpatory and a stark rebuttal of the Ramon Burton testimony.

37.     Ramon Burton is an individual of Jamaican descent who presented with a strong Caribbean accent and who was a confessed drug dealer, who was a wanted person out of Philadelphia at the time of the Lloyd murder, who used numerous alias', who also had entered the U.S. illegally.

38.     He ultimately testified at trial that, in the early morning hours of November 22, 1993, and at the behest of Edgar Clarke, a longtime acquaintance, he drove his girlfriend's Honda Accord to Clymer Street with another drug dealer, named Charles Brown. Burton testified that he saw Mr. Carson walking on Clymer Street with another man, both of whom began shooting at Burton's vehicle. Burton further testified that he exited the Honda accord and returned fire, striking the other individual. Burton's trial testimony went further to stated that after Mr. Carson fled Clymer Street, that Burton heard another set of gun shots, after a pause. Burton stated that he left the Honda Accord and his firearm on Clymer Street.

39.     PPD Officers knew that Burton was a known drug dealer, but more importantly that Burton was a fugitive in wanted status and potentially facing deportation, which was used to compel favorable trial testimony form Burton at the Carson trial.

40.      Eyewitness Ronald Waters, whose statement was concealed from Mr. Carson and his legal team provided a statement contradictory to Mr. Burton's statement.

41.     On November 24, 1993, at 1:30pm, inside of the homicide division of the PPD, Detective Mangoni secured the statement of eyewitness Ronald Waters. Mr. Waters stated that he was on Clymer Street at the time of the Lloyd murder. He stated that he traveled to the location in a Honda Accord given to him for repair by "a lady named Collie." Waters further stated that he traveled to Clymer Street for the sole purpose of purchasing crack cocaine and upon arrival, attempted to do so from Mr. Burton. Waters purchased crack cocaine from Burton on several occasions from that location. Prior to concluding the drug transaction, a lone gunman approached Burton, yelled at him, then began firing his weapon in Burton's direction. Waters fled the scene, abandoning the Honda Accord. Waters states that the following day he returned to Clymer Street to retrieve the Honda Accord but that it was no longer on location.

42.     The Waters statement, taken by Detective Mangoni, was purposely withheld from Mr. Carson and his defense team.

43.     On December 6, 1993, at 5:35pm, Detective Collins interviewed Charlene Matthews, the common-law wife of Ramon Burton. Ms. Matthews stated that, contrary to the Burton statement, that's she gave her car to a mechanic named "Ron" on November 21, 1993, to conduct repairs. Ms. Matthews further stated that Mr. Burton arranged for "Ron" to arrive at her home to retrieve both the keys and the vehicle; and that it was in fact, Mr. Burton who provided "Ron" with the keys and access to the vehicle.

44.     The Matthews statement, taken by Detective Collins, was purposely withheld from Mr. Carson and his defense team.

45.     PPD Officers knew that Burton was a known drug dealer, but more importantly that Burton was a fugitive in wanted status and potential facing deportation, which was used to compel favorable trial testimony form Burton at the Carson trial.

46.     On November 23, 1993, Homicide Detective R. Reinhold interviewed Gwendolyn Schilling at PPD headquarters. Ms. Schilling lived at 2033 St. Albans Street, the street directly south of Clymer Street. The rear of her house was on Clymer Street. The 2000 block of Clymer is an alley. In her statement, Schilling reported that she heard the shooting and afterwards looked out to see if anyone was running down the "alley," i.e., Clymer Street. She did not see anyone running, a statement which is contrary to the inadmissible, hearsay "flash information" the prosecution presented at trial that someone ran down the 2000 block of Clymer towards 20th Street. In closing, the trial prosecutor argued that the flash information – that someone ran down

Clymer Street toward 20th Street – was evidence that Petitioner was the shooter because that is where he lived.

47.     The Schilling statement, taken by Detective Reinhold, was purposely withheld from Mr. Carson and his defense team.

48.     Although the Philadelphia DAs Office possessed the statements of Waters, Matthews, and Schilling, it purposefully failed to disclose these statements to trial counsel.

49.     The withheld statements were purposefully excluded from the discovery letter sent by ADA Grant to the Carson trial counsel.

50.     The Commonwealth violated *Brady* by not producing these statements. They are impeaching and exculpatory.

51.     Trial counsel could have used these statements to challenge whether Burton was present at all, at the scene of the Lloyd murder. The withheld witness statements present diametrically opposed assertions about an indispensable fact, namely, who was present when the shooting began and whether Mr. Carson possessed, brandished and/or fired a weapon. They are both impeaching and exculpatory.

52.     Trial counsel could have used these statements to discredit the Commonwealth's investigation and the prosecution's case presented at trial.

53.     The suppression of the Schilling statement deprived trial counsel of direct evidence that the "flash information" was not reliable.

54.     The Commonwealth's case was tenuous because it was based on the testimony of only one eyewitness, Ruth Beverly. Beverly was known to have a chronic drug problem and

Troy Powell provided a statement that Beverly could not have possibly seen the shooting because she had collapsed to the ground prior to the shooting due to her own intoxication.

55.     The prosecution and/or PPD Officers used Burton's false testimony to bolster Beverly's testimony while simultaneously concealing the existence of evidence that contradicted both Burton and Beverly's testimony.

56.     Next, the Commonwealth presented testimony of Monique Wylie at the Carson trial. Ms. Wylie who had a criminal record that included convictions for robbery, burglary, and theft, was on probation at the time of the shooting; and was sentenced on a probation violation after the shooting and after she provided a statement favorable for the Commonwealth.

57.     Wylie met with ADA Desiderio prior to trial. During that meeting, Ms. Wylie provided a statement, ADA Desiderio offered to Ms. Wylie a reduced sentence on her probation violation if testified that Mr. Carson, along with others, solicited her to assist in a robbery attempt. Once Ms. Wylie refused, the Commonwealth introduced at trial, through Philadelphia Police Officer Glenn Keenan, implicating Mr. Carson in the robbery attempt.

58.     Ms. Wylie subsequently swore by affidavit, that she had not witnessed the Lloyd murder but was pressured directly by ADA Desiderio to testify that she had done so.

59.     PPD Supervisors and members of the DAs Office knew that Ms. Wylie had not witnessed the Lloyd murder or discussed a robbery plot with Mr. Carson prior to the Lloyd murder.

60.     Likewise, PPD Supervisors and members of the DAs Office knew that Ms. Wylie had not told Officer Keenan that she witnessed the Lloyd murder or discussed a robbery plot with Mr. Carson prior to the Lloyd murder.

V.      **Post-Trial Proceedings**

61.     Following his conviction, Mr. Carson continued to fight his wrongful convictions.

62.     Instead of acknowledging the clear constitutional error, for over two decades the DA's office continued to oppose relief in the present cases.

63.     On or about April 4, 2011, Mr. Carson was finally granted relief. His Death Penalty sentenced was commuted to life in prison and Mr. Carson was no longer subjected to the extremely harsh condition of a death row inmate.

64.     And on July 12, 2021, Mr. Carson's conviction for First Degree Murder was overturned.

65.      After the convictions were overturned, the District Attorney's office first offered Mr. Carson the option of 20-40 years of incarceration, for plea to Third Degree Murder and then time-served while he was still incarcerated.

66.     Mr. Carson was confronted with two options: (1) remain in custody for up to twelve more years pending a new trial or (2) enter a plea to a reduced charge for a prison sentence of less time.

67.     The District Attorney's Office subsequently offered Mr. Carson the option of 14-28 years of incarceration, with the understanding that he'd be released immediately. And on July 12, 2021, Mr. Carson entered a plea to Third Degree Murder before The Honorable Scott DiClaudio of the Court of Common Pleas in Philadelphia, who imposed the negotiated sentence.

68.     At the time that Mr. Carson was presented with the offer of 14-28 years of incarceration, he had already served 16 years on death row and an additional 11 ½ years as an inmate ostensibly serving life in prison.

69.     Mr. Carson was constructively coerced by the Philadelphia District Attorney's Office to enter a plea of guilty to robbery and criminal conspiracy when faced with the prospect of remaining in jail for an undetermined period to await a new trial, even though he was confident that he would be successful in gaining an acquittal at trial.

70.     The actions and conduct of the individual defendants as described above violated the plaintiffs' Fourteenth Amendment right to due process of law and a fair trial.

71.     The defendant officers and/or Assistant District Attorney(s) were deliberately deceptive by concealing and/or suppressing critical evidence and thus violated the plaintiff's right to due process of law and a fair trial.

72.     Defendants' failure to conduct a reasonably thorough investigation that considered evidence negating the existence of grounds to prosecute Plaintiffs, denied the plaintiff due process and a fair trial.

73.     The concealment and/or failure to disclose the relevant and material evidence described above violated the Plaintiff's right to due process of law and a fair trial.

74.     As a result of the actions and inactions of the defendant officers and/or Assistant District Attorney, Plaintiff was compelled to stand trial in a murder case, causing them substantial harms.

***The District Attorney's Office Maintained Unconstitutional Policies, Customs, and Practices Regarding the Suppression of Exculpatory Evidence in Violation of Brady v. Maryland***

75.     It is undeniable that Defendants Desiderio and Grant violated *Brady v. Maryland* in Carson's case and as a result he was wrongfully convicted of Capital Murder and unconstitutionally sentenced to death. Many if not all, of the violations in this case appear purposeful. The failure to disclose exculpatory evidence in Carson's case was not an isolated incident and instead was the result of customs, policies, and practices of the DAs Office prior to and at the time of the unlawful investigation into the Lloyd murder. The DAs Office, by and through its final policymakers, maintained an official policy, custom, or practice of suppressing exculpatory material in violation Carson's constitutional rights.

76.     By official police, practice, or custom, the DAs Office would fail to seek out any exculpatory information that was not affirmatively provided to them by the PPD and deliberately withheld official police paperwork, documents, witness statements, impeachment information, and other exculpatory material from the accused. Official written reports created by the PPD would be produced to the prosecutor and included in the prosecutor's file and subsequently given to defense. By contrast, internal exculpatory information was stored with the Homicide and Prosecutorial files and were not produced to anyone outside of the PPD and/or DAs Office.

77.     Similarly, prosecutors would not customarily contact PPD Detectives to seek out any information not affirmatively contained in the Detective's written report. Thus, for example, prosecutors would not customarily obtain any/all witness statements taken during the investigation but would instead rely on the final written report typically created only after an arrest.

78.     As a result of the unconstitutional policy and practice, exculpatory information was documented only in the internal PPD files, documents which were passed in discovery because of official policy, practice and custom.

79.     As a matter of custom, practice and policy the DAs office habitually encouraged prosecutors to avoid *Brady* obligations wherever possible.

80.     Former District Attorney Lynne Abraham, known reputationally as "America's Deadliest DA," was at all relevant times the chief policymaker in the DAs Office, and espoused a fundamentally incorrect and unconstitutional interpretation of *Brady*. ADA Shiver admitted at a post-conviction hearing for Christopher Williams that, the Commonwealth did not pass all activity sheet (daily investigation logs) as a matter of course. The Commonwealth has stipulated to that fact in two other proceedings.

81.     In addition, at the time of the Carson conviction, the DAs Office had no open file discovery; in other words, all discovery requests were within the discretion of the ADA. Moreover, ADAs faced significant pressure because the District Attorney expected that any case that was screened and accepted should result in conviction. This custom, policy and practice created a "win at all costs" mentality in the DAs Office. The DAs office perpetuated *Brady* violations by implementing a policy wherein ADAs did not review underlying PPD files in evaluating and responding to post-conviction claims of constitutional violations.

82.     These policies, customs and practices of the City of Philadelphia DAs Office were the moving force behind the suppression of both exculpatory and impeachment materials in the Carson case.

***The PPD's pattern and practice of unconstitutional misconduct in homicide
investigations, including the fabrication of evidence, coercion and threats to secure
false statements from witnesses and suspects, failure to conduct proper investigations***

83.     For many years dating back at least to the 1970's, and continuing well beyond the
time of the investigation of Mr. Lloyd's murder, the City of Philadelphia, had in force and effect
a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in
particular, using coercive techniques in interviews and interrogations to obtain incriminating
evidence; fabricating inculpatory evidence; conducting improper identification procedures;
concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and
fabricating incriminating statements from witnesses, suspects, and arrestees.

84.     This policy, practice, or custom involved the use of various techniques to coerce
incriminating statements, including without limitation: isolation; separating juvenile or otherwise
vulnerable suspects or witnesses from friends and family; subjecting individuals to needlessly
prolonged interrogations; making false promises, including the promise that a suspect or witness
will be allowed to go home if he or she makes an inculpatory statement and/or be given favorable
treatment; the use or threat of physical violence; authoritative assertions of a suspect's guilt,
including without limitation confrontation with false inculpatory evidence; and providing false
assurances—including to juveniles and other vulnerable people—that the suspect or witness will
benefit from making an inculpatory statement that minimizes the suspect's own involvement.

85.     These practices were well known to the City of Philadelphia and its policymakers
with respect to criminal investigations and prosecutions as a result of newspaper investigations
including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977, governmental
investigations, complaints from lawyers and civilians, and internal police investigations.

17

86.     Various cases demonstrate that this misconduct was pervasive within the

Philadelphia Police Department at time of Plaintiffs' 1996 trial, and, upon information and

belief, the misconduct described below was committed with the knowledge of Homicide Unit

and PPD supervisors or because of their deliberate indifference to this misconduct.

    a.    **Anthony Wright** (CP-51-CR-1131582-1991).  Mr. Wright had been convicted of
the rape and murder of an elderly woman based on misconduct by homicide
detectives including the tampering with evidence, coercive witness interrogation,
planting evidence and numerous other actions that denied Mr. Wright a fair trial.
After spending nearly twenty-five years in prison, Mr. Wright was exonerated by
DNA evidence.

    b.    **Carlos Hernandez** (CP-51-CR-0302131-1991) & Ed Williams. A woman and
her boyfriend were robbed at gunpoint by two men and her boyfriend was shot.
Detectives interrogated a key witness, Juan Sanchez, and extracted a statement
from him implicating Carlos Hernandez and another man. Mr. Sanchez described
the circumstances of his statement as follows: the detective held him in custody
and interrogated him for three days, without food or water; he was denied use of
the bathroom and had to urinate on the floor; the detective hit him several times.
After coercing Mr. Sanchez's statement, the detective interrogated Mr. Hernandez
and obtained a statement from him implicating Ed Williams. Mr. Hernandez
described the circumstances of his statement as follows: the detective had him
handcuffed to a chair and held him without water, food, or use of a bathroom; the
detective punched him in the face and pressed his foot on Mr. Hernandez's crotch
until he relented and signed the statement. Later it was proved that Mr. Williams
was in a secured drug treatment facility at the time of the crime.

    c.    **Jackie Combs Jr.,** PPD detectives coerced four young witnesses into testifying
against Mr. Combs for a murder that he denies committing. One of those
witnesses, just 15 at the time, has told reporters that she felt "it's my fault,
because I changed my story, saying this man killed this guy [and] knowing he
didn't do it." The witnesses, who gave varied accounts of the killing, have
explained that their statements were the result of physical and verbal abuse by
detectives.

    d.    **Willie Veasy** (CP-51-CR-0641521-1992). Mr. Veasy was convicted of a murder
that occurred in South Philadelphia while he was working at a popular and busy
restaurant. Mr. Veasy was interrogated by detectives until he provided a
"confession." Mr. Veasy has described that the detective isolated him in an
interrogation room where the detective smacked him around and kicked his
testicles several times until Mr. Veasy agreed to sign the "confession."

e.   **Percy St. George** (CP-51-CR-1012571-1993). In investigating a murder, the detective obtained a statement from a witness who, because there were warrants out for his arrest, signed the statement under a friend's name: David Glenn. As trial approached, PPD officers picked up the actual David Glenn. At the station, the detective coerced the real David Glenn into signing a new false statement saying he saw the crime and identifying Mr. St. George from a sham photo array prepared by the detective. After David Glenn testified regarding the detective's misconduct and disavowed the statement the detective had coerced him to sign, the detective notified the Court and the Commonwealth of his intention to assert his 5th Amendment right against self-incrimination to avoid having to testify about his actions in that case.  Shortly after receiving this letter from the detective's counsel, the prosecution dismissed all charges against St. George, but the detective remained with the PPD through September 1996.

f.   **Andrew Swainson** (CP-51-CR-0431331-1988). In 1989, Andrew Swainson was convicted of murder on the statement of a single eyewitness, Paul Presley—an original suspect arrested for the shooting moments after it occurred, covered in blood and running from the scene at 3:40 a.m. The prosecution dropped charges against Presley three weeks later. Detective Santiago soon took a statement from Presley. Presley explained Det. Santiago's tactics: Presley had not seen Swainson at the time of the shooting, and only knew what he looked like because he'd been shown his picture by Det. Santiago. Rather than showing Presley a real photo array, all seven photos that Det. Santiago showed Presley were of Swainson. Presley explained that he only testified against Swainson because he was coerced with threats of being charged for a separate drug crime. (Presley was charged under a different name, and the Commonwealth never disclosed the matter *Commonwealth v. Kareem Miller*, DC No. 881855934; CP-51-CR-1024751, to Mr. Swainson.) Mr. Swainson has a PCRA petition pending and is represented by counsel from Morgan Lewis.

g.   **Walter Ogrod** (CP-51-CR-0532781-1992). Mr. Ogrod, a trucker with a low-average IQ, was sentenced to death for the murder of a four-year-old girl based entirely on a "confession" Ogrod gave to Detective Devlin. Ogrod had driven all night and had not been to bed in 36 hours when Det. Devlin went to work. According to Det. Devlin, about an hour into the interrogation, Ogrod supposedly burst into tears and gave a 16-page confession. Ogrod, however, has claimed that he was interrogated for hours by Det. Devlin and a second detective. He finally broke from lack of sleep and began to believe what they detectives fed him— eventually signing the statement written out in longhand by Det. Devlin. After hearing Ogrod's testimony, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Mr. Ogrod has a PCRA petition pending and is represented by counsel from Morgan Lewis and the Federal Defender.

87.     At the time of the investigation and prosecution of Plaintiff between 1993-1996, the PPD had a policy, practice, or custom of detaining, arresting, and interrogating purported witnesses without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, and/or for material benefits. These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel, even where the purported witness and/or her attorney sought the right to consult.

88.     This practice, as exemplified by the investigations in Plaintiffs' case and those detailed above, continued for years due to the deliberate indifference of the PPD and City of Philadelphia to this policy, practice, and custom.  Finally, in 2014, after further proof of this policy, practice, and custom was provided to the PPD, the District Attorney, and the City, the PPD issued Directive 151 (January 1, 2014), that provided legal standards for the detention and interview of witnesses and the detention and interrogation of suspects by police detectives.

89.     During the 1980's and early 1990's, and concurrent with the time of the investigation of this case by the PPD, there was within the Department a pattern, practice, and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.  On three separate occasions in the 1980's courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in these practices. *See Cliett v. City of Philadelphia*, C.A. No. 85-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia*, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia*, C.A. No. 88-2264

(E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

90.     Thereafter in the late 1980's and early 1990's a narcotics squad operating out of the 39th Police District in Philadelphia engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the PPD, including the disregard of credible complaints to IAD and District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

91.     This systemic and unconstitutional practice and custom was ended only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office. As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Plaintiffs were charged, a Court in the Eastern District entered a Consent Decree requiring wide ranging reforms in the Philadelphia Police Department, and in particular providing for specific limitations on the investigative practices and policies of the PPD. *See NAACP v. City of Philadelphia*, C.A. No. 96-6045.

92.     In summary, at the time of the investigation and prosecution of Plaintiff, the PPD had a practice, policy, and custom of:

    a.      Engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, using improper

identification procedures, and concealing and/or failing to disclose exculpatory evidence;

b.    Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or violate generally accepted police practices;

c.    Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

d.    Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

e.    Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Plaintiffs.

93.    At the time of the investigation and prosecution of Plaintiffs, and for many years before and thereafter, the PPD and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. The Internal Affairs Division (IAD) of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a.    excessive and chronic delays in resolving disciplinary complaints;

b.     a lack of consistent, rational and meaningful disciplinary and remedial actions;

c.     a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d.     the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e.     the PPD discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to the number of violations;

f.     the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g.     a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.     serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i.     lack of an effective early warning system to *i* dentify, track, and monitor "problem" officers;

j.     IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct; interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.     IAD failed to acknowledge the disproportionate and extreme use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use

of force.

### *The PPD's and DAs Office pattern and practice of unconstitutional misconduct in homicide investigations, regarding coerced confessions*

94.     Prior to and at the time of the unlawful investigation into the Lloyd murder, PPD and the DAs Office, by and through their final policymakers, maintained policies, customs, or patterns and practices of fabricating incriminating evidence and coercing false statements.

95.     In particular, the PPD and the DAs Office used unconstitutional techniques during the investigation phase of a case to coerce inculpatory statements from suspects and witnesses by giving those suspects and witnesses details about the crime; this also included (but is not limited too) making false promises, this included promises that a suspect/witness would be given lenient sentences for criminal charges that they faced, assistance in deportation matters, and threats of physical violence. These techniques attempt to make false and coerced statements seem credible and reliable.

96.     Upon information and belief, these polices, practices and customs were well known to the PPD, the DAs Office and the City of Philadelphia and its policymakers; and they began long before the Carson case and perpetuated long after. These policies, practices and customs have resulted in similar violations committed by the PPD and the DAs Office, which illustrate the departments as a whole, and as a matter of custom, practice, and policy, disregarded their obligations to refrain from coercing and fabricating evidence merely to close cases.

97.     At all times relevant, DAs Office policies, customs and practices of unconstitutionally coercing and fabricating witness and suspect statements to close cases was not conducted in a prosecutorial role, but as an investigative function normally performed by a detective or police officer.

24

98.     Indeed, the unconstitutional acts described herein – namely the coercion and falsification of statements procured from Monique Wylie, Ramon Burton, and Edgar Clark inculpating Mr. Carson in the Lloyd murder were a blatant exercise of custom, practice and policy. Furthermore, once ADA Desiderio could not get Ms. Wylie to give the false inculpating statement in open court regarding Mr. Carson, Desiderio then summoned the services of Police Officer Keenan to state that Ms. Wylie made the inculpatory statements on a prior occasion.

99.     ADA Desiderio acted in concert with the PPD, as an investigator and as an advocate for the Commonwealth.

100.    In addition to the DAs Office's unconstitutional policies, customs and practices found above, Defendants policy of coercing and falsifying witness statements to inculpate wrongfully convicted individuals is further illustrated by the unconstitutional incidents below, which all occurred during the relevant period.

    a.    **Malcolm Medley** In 1988, Malcolm Medley was convicted in the Court of Common Pleas of aggravated assault, carrying firearms on public streets or public property, criminal conspiracy, and possessing a criminal instrument. In 1987, Medley and Alford were found in possession of a car potentially involved in a shooting, handcuffed, and immediately taken to the police station. Detective Francis Anel took a statement from Alford, while Medley was locked in the waiting area until Detective Denham took his statement, wherein no Miranda Warnings were given. The Supreme Court held that "the conduct of the police officers placed Medley in a situation in which he could have reasonably believed that his freedom of movement had been restricted. Indeed, it would difficult to imagine a situation more likely to produce a belief that one's freedom of movement is restricted than that of being frisked, handcuffed and transported to a police station. *See Commonwealth v. Medley*, 531 Pa. 279 (1992).

    b.    **Tramayne Blacknall** (CP-51-CR-0802721-1999) Blacknall was found guilty of the 1998 murder of Rashawn Calhoun on August 2, 2001, and acquitted of the murder of Eric Bakerville. Mr. Bakerville allegedly had fired shot in Blacknell's direction in September or 1998 but struck Herb Bryant in the ankle. At least one witness, Steven Driver, alleged he provided a statement implicating Blacknall because police, threatened to charge him and his brother Clinton Driver for the

murders. Driver testified that Blacknall was not involved in the shooting. Blacknall was granted a new trial on July 13, 2012, based on newly discovered evidence, including alibi testimony and testimony that Clinton Driver confessed to committing the crime.

c.      **Donald Ray Adams** (CP-51-CR-0743812-1991) Adamas was arrested and convicted for the murders of Darryl Patterson and Thomas Winn, which occurred in 1990. PPD Detectives investigated the matter in 1991 after no suspects were arrested. PPD Detectives obtained a coerced and false statement from alleged witness Donna Benjamin, implicating Mr. Adams in the crime, despite contradictory accounts of the physical description of the assailant. Based on this statement and Benjamin's later testimony, Adams was convicted. In 2007, the Court of Common Pleas granted post-conviction relief based on Benjamin's recanted testimony along with allegations that Detectives threatened her with incarceration, promised that her open criminal charges would be dismissed, and offered her financial and other support in exchange for testifying against Adams. Furthermore, other evidence pointed toward, an individual named "Don Ray" who lived nearby the victims, fit the physical description, and who had an ongoing dispute with the victims. Benjamin later admitted that it was "Don Ray" and not Donald Ray Adams that was the assailant. After a retrial, Adams was acquitted of all charges.

101.      During the investigation and prosecution of Carson for the Lloyd murder, the PPD and DAs Office had policies, practices and customs of arresting, charging, and interrogating purported witnesses in criminal investigations without legal cause and with the intent to coerce and/or fabricate statements from these persons, under threat of punishment or material benefit.

102.      The unconstitutional policies, practices and customs mentioned herein directly caused the incarceration and conviction for Capital Murder of Mr. Carson, due to the deliberate indifference of the PPD, City of Philadelphia, and the DAs Office.

### *PPD's Custom, Pattern and Practice of Failing to Adequately Supervise and Discipline Problem Officers*

103.      The Constitutional violations that caused Carson's conviction resulted directly from the PPD's failure to provide adequate supervision, discipline and training to deter its

officers from: (i) coercing witnesses to obtain unreliable and falsified information that could be used to close cases; (ii) deliberately and frequently deeming credible and relevant tips, information and evidence unfounded or unrelated based on false and unreliable grounds; and (iii) knowingly failing to disclose exculpatory information contained within internal documents in its official police reports or to disclose such information to the defense through testimony or other means. The PPD also failed to provide adequate supervision, discipline, and training to its officers to ensure that officers, including supervisors, met their obligations to report and discipline misconduct by fellow officers.

104.    Defendant PPD Officers' misconduct and illegal acts were widely known at every level of the PPD. Supervisors had both contemporaneous knowledge of the unconstitutional acts of its officers in Carson's case and knowledge of a prion pattern of similar incidents. Despite knowledge of the conduct, PPD Officers suffered no significant discipline and continued their pattern and practice of misconduct.

105.    Throughout Defendants Officers' tenure at the PPD, the Department failed to implement adequate policies, training, procedures and guidelines to: (1) protect integrity, legitimacy and accuracy of investigations, prosecutions and convictions; (2) require exculpatory information to be recorded in a format that would be disclosed to the prosecution and the defense after a suspect was arrested and charged; and (3) not discredit reliable, trustworthy, and consistent exculpatory information and unfounded or irrelevant and subsequently suppress that evidence from the defense. The lack of adequate ad appropriate supervision demonstrates a deliberate indifference toward the known risks that individuals would be accused and convicted of crimes that they did not commit.

106.     The multiple red flags in this investigation, including without limitation the

failure to conduct basic investigatory steps, the absence of proper documentation of investigatory

steps, the absence of inculpatory information other than one dubious unsupported eyewitness

account from a self-professed drug addict.

107.     As a predictable and foreseeable result of those failure to act, Carson was wrongly

convicted of Capital Murder and incarcerated after an unconstitutional and unfair trial based on

suppressed exculpatory information and false information that was coerced by Defendants PPD

and ADA Desiderio, in violation of the United States and Pennsylvania Constitutions.

## VI.     CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence Under the Fourteenth Amendment
*Against All Individual Defendants*

108.     Plaintiff incorporates by reference all the foregoing paragraphs.

109.     The individual defendants, acting individually and in concert, and within the scope

of their employment with the City of Philadelphia, deprived Plaintiffs of their clearly established

constitutional right to due process of law and to a fair trial when the defendant officers and / or

defendant assistant district attorneys deliberately deceived counsel and the court by concealing

and/or suppressing relevant and material evidence linking fewer than four people to the scene of

the crime, evidence of alternative suspects, and undisclosed reports of crime on the same night

and in the same vicinity implicating Commonwealth witnesses.

110.     More specifically, ADA Desiderio, individually and in concert with the DAs

Office and the PPD Officers, improperly and unconstitutionally coerced both Mr. Burton, Ms.

Wylie and Officer Keenan to fabricate false testimony inculpating Carson and used these false statements against Carson at trial; and also suppressed critical impeachment evidence that would have contradicted or impeached each of the Commonwealth's witnesses who testified against Carson at trial; thereby violating rights guaranteed Carson under the Fourth and Fourteenth Amendments.

111.    ADA Desiderio and PPD Officers' unconstitutional conduct in coercing and fabricating witness testimony was an investigative function normally performed by detectives or police officers.

112.    Defendants deprived Carson of his right to a fair trial by deliberately and improperly fabricating the false testimony of Mr. Burton, Ms. Wylie and Officer Keenan as well as suppressing the inculpatory statements of Mr. Waters, Ms. Schilling, and Ms. Matthews.

113.    Defendants did so intentionally, recklessly or in bad faith and Defendants knew that their illegal conduct would rend to show that Carson was not innocent of the Lloyd murder.

114.    Had Defendants' fabrications and suppressed material, exculpatory and impeachment evidence been known to Carson, been documented, and/or disclosed, Carson would have tended to prove his innocence, cast doubt on the entire police investigation and prosecution, and had been able to impeach critical trial testimony. The exculpatory and impeachment evidence withheld by Defendants undermined confidence in the verdict against Carson, and the concealment of this evidence further deprived Carson of a fair trial.

115.    The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to

Plaintiffs clearly established constitutional rights.  No reasonable officer or assistant district attorney in 1993-1996 would have believed this conduct was lawful.

116.    Defendants' acts and omissions, as described above, were the direct and proximate cause of Plaintiff's injuries. Defendants knew, or should have known, that their conduct would result in Plaintiff's wrongful trial at which they faced the death penalty, and the harms he sustained as a direct result.

**COUNT II: 42 U.S.C. §1983 Civil Rights Conspiracy**
*Against All Individual Defendants*

117.    Plaintiff incorporates by reference all the foregoing paragraphs.

118.    The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert to deprive Plaintiffs of their clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process of law, and to a fair trial.

119.    In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, but not limited to the following:

a.    Deliberately deceiving counsel and the court by concealing and/or withholding relevant and material evidence, fabricating evidence, tampering with evidence, and using coercion and/or threats to obtain inculpatory witness statements; and

b.    Failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to believe Plaintiffs had committed the crime and ignoring evidence that exculpated Plaintiffs.

120.     Defendants' acts and omissions, as described above, were the direct and proximate cause of Plaintiffs' injuries.  Defendants knew, or should have known, that their conduct would result in Plaintiffs' denial of due process and a fair trial.

**COUNT III: 42 U.S.C. § 1983 Malicious Prosecution**
*Against All Individual Defendants*

121.     Plaintiff incorporates by reference all the foregoing paragraphs.

122.     Defendants acting individually and in concert, with malice and knowing that probable cause did not exist to prosecute Carson for Capital Murder, thereby causing Plaintiff to be arrested, charged and prosecuted for those crimes, thereby violating his clearly established right, under the Fourth and Fourteenth Amendments to the United States Constitution, to be free from prosecution absent probable cause.

123.     Specifically, as described above, Defendants, acting individually and in concert, fabricated inculpatory evidence and intentionally or recklessly withheld and misrepresented exculpatory facts that they knew would have vitiated probable cause against Carson's and that they knew would have impeached witnesses for the prosecution at trial, including but not limited to the fact that Defendants coerced or otherwise fabricated evidence against Carson – Wylie's and Keenan's statements and testimony. These actions caused Carson to experience drastically more harsh conditions of confinement has a death row inmate.

124.     Carson is innocent of Capital Murder and/or First-Degree Murder.

125.     Carson's was initially granted relief on April 4, 2011, once his sentence was commuter from death to life in prison; and again, on July 12, 2021, when his murder conviction was overturned.

31

126.    Carson has suffered irreparable damage arising from the 16 years spent on the Death Row in the Pennsylvania Prison System.

127.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and/or with deliberate indifference to Carson's clearly established Constitutional rights.

128.    The acts and omissions by Defendants described in the preceding paragraphs were the direct and proximate cause of Carson's injuries because the Defendants knew, or should have known, that their conduct would result in the wrongful conviction and incarceration of Carson for Capital Murder.

## COUNT IV: 42 U.S.C. § 1983 Failure to Intervene
*Against All Individual Defendants*

129.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

130.    By their conduct, under color of state law and acting within the scope of their employment with the City of Philadelphia, the individual defendants had opportunities to intervene on behalf of Plaintiffs to prevent the deprivation of liberty without due process of law and to ensure their right to a fair trial, but with deliberate indifference failed to do so.

131.    The defendants' failures to intervene violated Plaintiffs; clearly established constitutional right not to be deprived of liberty without due process of law and a fair trial as guaranteed by the Fourteenth Amendment. No reasonable police officer or attorney in 1993-1996 would have believed that failing to intervene to prevent these defendants deliberately deceiving counsel and the court, failing to conduct a constitutionally adequate investigation, and causing Plaintiffs to be subjected to an unfair trial, were lawful.

132.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Plaintiffs' injuries. Defendants knew, or should have known, that their conduct would result in Plaintiffs' unfair trial.

**COUNT V: 42 U.S.C. § 1983 Supervisory Liability Claim**
*Against City of Philadelphia, Philadelphia Police Department,*
*Philadelphia DA's Office, and Lynne Abraham,*

133.    Plaintiff hereby incorporates by reference all the foregoing paragraphs.

134.    Defendants Grant, Desiderio, Mangoni, Collins, Reinhold, and Keenan acted with impunity in an environment in which they were not adequately supervised, disciplined or trained as a matter of practice.

135.    Supervising Defendants acted with gross negligence, recklessness, and/or deliberate indifference to the Constitutional Rights of citizens by failing to provide adequate training, supervision, and discipline of the Defendants Officers and ADAs Desiderio and Grant. This caused Carson to be deprived of clearly established Constitutional rights, including his rights to be free from cruel and unusual punishment, malicious prosecution, and the deprivation of liberty without due process of law, and his right to a fair trial.

136.    As a direct and proximate cause of Defendant's actions, Carson was wrongly convicted of Capital Murder and imprisoned on death row for 16 years, sustaining other grievous and continuing damages and injuries.

**COUNT VI: 42 U.S.C. § 1983 Monell Claim**
Unconstitutional Customs, Policies, and Practices
*Against Defendant City of Philadelphia*

137.    Plaintiff incorporates by reference all the foregoing paragraphs.

138.    Defendant, City of Philadelphia was at all times relevant to this complaint responsible for the polices, practices, and customs of the PPD. The City of Philadelphia employed all of the individual Defendant PPD Officers.

139.    Likewise, Defendant, City of Philadelphia was at all times relevant to this complaint responsible for the polices, practices, and customs of the District Attorney's Office. The City of Philadelphia employed all the individual Defendant ADAs.

140.    The City of Philadelphia by and through its respective final policymakers, had in force and effect during the investigation of the Lloyd murder and for years before and after, a policy, practice, or custom of unconstitutional misconduct in serious felony investigations, including, in particular, the encouragement and use of coerced and unreliable witness statements and the failure to disclose material, exculpatory evidence including, but not limited to witness statements and/or information contained therein.

141.    Indeed, the City of Philadelphia was aware of, deliberate indifference to the following unconstitutional misconduct of the PPD, the DAs Office and the individual officers and prosecutors at the time of Carson's wrongful conviction and incarceration for Capital Murder:

a.    Using coercive techniques to obtain confessions, such as threats of violence, false promises, and the use of prolonged interrogation. (i.e. Mr. Burton)

b.    Fabricating incriminating statements and providing witnesses with details of the crime (i.e. Ms. Wylie)

c.    Fabricating inculpatory evidence

d.    Withholding exculpatory evidence

e.    Failing to adequately discipline officers or prosecutors who engaged in
unconstitutional conduct.

f.    Failing to adequately train and supervise officers, ignoring systematic misconduct
ad abuse of civilian rights,

g.    Failing to discipline officer or prosecutors who failed to report the
unconstitutional conduct, and

h.    Failing to train officers and prosecutors on Brady evidence and/or PCRA
procedures

142.    City of Philadelphia by and through its final policymakers had in force and effect
during the investigation of the Lloyd murder and for years prior a policy, practice, or custom of
deliberately withholding exculpatory and impeachment evidence from criminal defendants like
Mr. Carson, in violation of Constitutional rights established by *Brady v. Maryland*.

143.    Specifically, PPD Officers and prosecutors in the DAs Office systematically
failed to turn over evidence that would undermine the reliability of a witness who had provided
false, coerced testimony under the threat of arrest or promise of favor.

144.    Likewise, PPD Officers and prosecutors in the DAs Office systematically failed to
turn over evidence that was plainly exculpatory and that would cast doubt on the arrests of
suspects.

145.    City of Philadelphia by and through its final policymakers had in force and effect
during the investigation of the Lloyd murder and for years prior a policy, practice, or custom of

failing to adequately supervise, discipline, and train officers investigating serious felony offenses.

146.     Final policymakers for the City of Philadelphia had actual and constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that PPD Officers and prosecutors in the DAs Office used the misconduct described above to improperly investigate and close cases. Final policymakers for the City of Philadelphia had actual and constructive notice that widespread failures to supervise or discipline officers and prosecutors for misconduct committed during the course of serious felony investigations, such as fabrication of evidence, coercion of false testimony, and suppression of exculpatory evidence, enabled officers and prosecutors to engage in misconduct without consequence. The continued adherence to these unconstitutional customs, practices and/or polices amounted to deliberate indifference to the constitutional rights of criminal defendants like Carson.

147.     Despite repeated opportunities to do so during the Lloyd murder investigation and for years beforehand, final policymakers for the City of Philadelphia failed to adequately discipline, supervise and train officers and prosecutors for failing to use proper and legal investigative tactics by coercing informants to provide false evidence, intentionally or recklessly discrediting exculpatory evidence.

148.     Such unconstitutional municipal customs, practices, and policies were the moving force behind Carson's wrongful conviction of Capital Murder and his 16 years of wrongful incarceration on death row, as well as all the other grievous injuries and damages sustained by Plaintiff.

**COUNT VII: 42 U.S.C. § 1983 Municipal Liability Claim**
*Against Defendant City of Philadelphia*

149.    Plaintiff incorporates by reference all the foregoing paragraphs.

150.    The City of Philadelphia, by and through its final policymakers, had in force and effect during time of Plaintiffs' arrest and trial, and for many years preceding and following the trial, a policy, practice, or custom of unconstitutional conduct in homicide and other criminal investigations, that included using coercive techniques in interviews and interrogations; fabricating evidence; fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, threats, and suggestion; tampering with evidence; planting evidence; concealing and/or withholding exculpatory evidence; and failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute.

151.    Policymakers for the City of Philadelphia had actual or constructive notice of the above practices, policies, and customs, but repeatedly failed to undertake any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations: withholding exculpatory evidence; fabricating inculpatory evidence; tampering with evidence; planting evidence; fabricating incriminating statements from witnesses, suspects, and arrestees; failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute; and failing to take appropriate remedial and/or disciplinary actions to curb the above misconduct.

152.    The unconstitutional municipal customs, practices and/or policies described above were the moving force behind Plaintiff's trial for capital murder, and the other injuries and damages set forth in this Complaint.

### COUNT VIII: DAMAGES
*Against All Defendants*

153.    Plaintiff incorporates by reference all the foregoing paragraphs.

154.    The unlawful, intentional, willful, deliberately deceptive, reckless, deliberately indifferent, and/or malicious actions and omissions of all defendants caused Plaintiff to be compelled to stand trial facing the death penalty which resulted in pain and suffering, mental anguish, emotional distress, restrictions on personal liberty, loss of freedom, deprivation of familial relationships, economic harms, and other associated damages.

### COUNT XI: PUNITIVE DAMAGES
*Against All Individual Defendants*

155.    Plaintiff incorporates by reference all the foregoing paragraphs.

156.    The defendant officers acted willfully, deliberately, maliciously or with reckless disregard of the plaintiff's constitutional rights and punitive damages should therefore be awarded against the individual defendants.

**WHEREFORE**, Plaintiff Samuel Carson requests the following relief:

a.      Compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b.      Punitive damages to Plaintiff and against all individual Defendants, jointly and severally, in an amount to be determined at trial;

c.      Pre-judgment and post-judgment interest and recovery of Plaintiff costs, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988 for all 42 U.S.C. §1983 claims;

d.      Any and all other relief to which Plaintiff may be entitled; and

e.      A jury trial as to each defendant and as to each count.

_s/Kevin Mincey_
Kevin Mincey, Esquire
MINCEY FITZPATRICK ROSS, LLC
1650 Market Street, 36th Floor
Philadelphia, PA 19103
(215) 587-0006
Counsel for Plaintiffs


_s/Shawn K. Page_
Shawn K. Page, Esquire
MINCEY FITZPATRICK ROSS, LLC
1650 Market Street, 36th Floor
Philadelphia, PA 19103
(215) 587-0006
Counsel for Plaintiffs